ATTORNEY GENERAL v PUBLIC SERVICE COMMISSION

Docket Nos. 231129, 232426. Submitted July 11, 2001, at Lansing. Decided July 24, 2001, at 9:10 A.M.

The Public Service Commission (PSC) entered financing orders approving the securitization of certain regulatory assets and other qualified costs regarding Consumers Energy Company pursuant to the provisions of the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq.* The Attorney General brought two appeals from the orders, and the appeals were consolidated.

The Court of Appeals *held*:

1. The PSC properly applied the formula set forth in MCL 460.10i(1) in entering the orders, met the requirement in MCL 460.10i(2)(b) that the PSC ensure that "securitization provides tangible and quantifiable benefits to customers of the electric utility," and properly rejected the method of calculation sought by the Attorney General because that method of calculation failed to take into account the substantial amount of savings flowing from securitization. The PSC's interpretation of the formula is entitled to deference because it is consistent with the plain language of the statute and avoids an unworkable result.

2. The plain language of the statute expressly authorizes the PSC to determine whether a particular item is a "qualified cost" under MCL 460.10h(g).

Affirmed.

*Jennifer M. Granholm*, Attorney General, *Thomas L. Casey*, Solicitor General, and *Theodore E. Hughes*, *J. Peter Lark*, and *Donald E. Erickson*, Assistant Attorneys General, for the Attorney General.

*Cummins Woods* (by *Thomas E. Woods*, Special Assistant Attorney General), for the Public Service Commission.

*David A. Mikelonis, Jon R. Robinson,* and *John C. Shea,* for Consumers Energy Company.

Before: NEFF, P.J., and O'CONNELL and R. J. DANHOF*, JJ.

O'CONNELL, J. In these consolidated cases, appellant Attorney General appeals as of right from financing orders entered by the Public Service Commission (PSC) pursuant to the Customer Choice and Electricity Reliability Act, MCL 460.10 *et seq.* We affirm in both cases.

In connection with the deregulation of the electric utility industry, the Customer Choice and Electricity Reliability Act mandated an immediate five percent reduction in electric rates in exchange for implementation of a plan to allow electric utilities to refinance certain amounts, identified as "qualified costs" in the act, through the issuance of low-interest securitization bonds. "Qualified costs" are defined by MCL 460.10h(g):

> "Qualified costs" means an electric utility's regulatory assets as determined by the commission, adjusted by the applicable portion of related tax credits, plus any costs that the commission determines that the electric utility would be unlikely to collect in a competitive market, including, but not limited to, retail open access implementation costs and the costs of a commission approved restructuring, buyout or buy-down of a power purchase contract, together with the costs of issuing, supporting, and servicing securitization bonds and any costs of retiring and refunding the electric utility's existing debt and equity securities in connection with the issuance of securitization bonds. Qualified

---

* Former Court of Appeals judge, sitting on the Court of Appeals by assignment.

costs include taxes related to the recovery of securitization charges.

By statute, the five percent rate reduction must be funded entirely by the savings realized as a result of the refinancing of the qualified costs through the bond sale. MCL 460.10d(4). Any additional savings from securitization must also be applied toward further reductions in rates or charges. MCL 460.10d(4) and (5).

To facilitate the PSC's oversight of the process, the act requires PSC approval, through financing orders, of the evaluation of qualified costs and amount of the bonds. See, e.g., MCL 460.10i(1). In July 2000, Consumers Energy Company filed an application seeking a financing order authorizing the issuance of securitization bonds. After extensive hearings, the PSC issued the first financing order in this case on October 24, 2000, approving securitization of up to $468,592,000 of Consumers' qualified costs.

During the administrative proceedings, the Attorney General challenged Consumers' method of performing the calculation required by MCL 460.10i(1), arguing that a "cash flow" analysis was more appropriate than a "revenue requirements" approach. The PSC rejected this argument as inconsistent with the plain language of that section, which specifies that the calculation be based in part on the "net present value of the revenues to be collected under the financing order . . . ." The PSC further found that the future income taxes that Consumers would have paid on the collected revenues could not be included in the qualified costs subject to securitization, but that such expenses were recoverable separately.

The Attorney General also argued that Consumers improperly included its Palisades Nuclear Power Plant as a regulatory asset subject to securitization. Rejecting this argument, the PSC noted that a significant portion of the utility's investment remained on the books, that the plant was an unlikely candidate for sale to another entity at or near its value, and that there was insufficient time for Consumers to recover its investment before deregulation occurred. The PSC concluded that its commitment to the full recovery of expenditures relating to nuclear power, coupled with the fact that Detroit Edison's similar Fermi II power plant had been previously designated a regulatory asset, compelled the conclusion that Consumers' Palisades plant be given the same classification.

As part of its proposal, Consumers also sought to recover the five percent reduction in rates since the June 5, 2000, effective date of the act. The PSC denied this proposal. After the financing order was issued, Consumers moved for rehearing on this issue, arguing that it should be allowed to recover the five percent rate reduction from the date of the financing order until the date of the sale of the bonds. Consumers also contended that the amount of the reduction should be considered a regulatory asset. The PSC agreed in part, stating that its intention was "that Consumers have an opportunity to recover from its securitization savings the full cost of the residential rate reduction beginning with the date that the financing order was issued." However, the PSC again declined to declare the lost revenues a regulatory asset, because such a declaration would imply that Consumers would be entitled to recover the full

amount of the rate reduction retroactive to June 2000, contrary to the commission's October 24, 2000, order.

Pursuant to MCL 460.10i(8), we review the PSC's financing orders to determine whether they "conform[] to the constitution and laws of this state and the United States and [are] within the authority of the commission under th[e] act." Statutory interpretation presents a question of law that we review de novo. *Adams Outdoor Advertising, Inc v Holland*, 463 Mich 675, 681; 625 NW2d 377 (2001). However, we afford " 'due deference to the administrative expertise of the PSC' " and do not substitute our judgment for that of the commission. *Attorney General v Public Service Comm*, 244 Mich App 401, 406; 625 NW2d 786 (2001), quoting *Attorney General v Public Service Comm*, 231 Mich App 76, 78; 585 NW2d 310 (1998); see also *Bagley Acquisition Corp v Detroit Edison Co*, 229 Mich App 172, 174; 581 NW2d 286 (1998); *City of Marshall v Consumers Power Co (On Remand)*, 206 Mich App 666, 676-677; 523 NW2d 483 (1994).

On appeal, the Attorney General argues that the PSC misapplied the formula set forth in MCL 460.10i(1) and erred in finding that the standard set forth in MCL 460.10i(2)(b) was met. Subsection 10i(1) provides:

Upon the application of an electric utility, if the commission finds that the net present value of the revenues to be collected under the financing order is less than the amount that would be recovered over the remaining life of the qualified costs using conventional financing methods and that the financing order is consistent with the standards in subsection (2), the commission shall issue a financing order to allow the utility to recover qualified costs.

Subsection 10i(2)(b) requires that the PSC ensure "[t]hat securitization provides tangible and quantifiable benefits to customers of the electric utility."

Consumers' expert testified that the present value of the revenues to be collected under the financing order, or the present value of the utility's revenue requirements over the next fourteen years with securitization, would be $538,587,000. This was compared to a present value of $619,746,000 in revenue requirements over the same period with conventional financing. Thus, securitization yields a present value savings of $81,159,000. The PSC staff concurred in this analysis. In the Attorney General's view, the phrase "revenues to be collected under the financing order" as set forth in MCL 460.10i(1) means the actual revenues collected by the utility. Under the analysis put forth by the Attorney General's expert, the revenue collected during the rate freeze will be the same with or without securitization. According to the Attorney General, the proposed securitization fails the test in subsection 10i(1) and there is no benefit to ratepayers as required by subsection 10i(2)(b). We disagree.

Underlying the Attorney General's calculation is the assumption that ratepayers will not realize any benefit during the first three years of the rate freeze. However, the act clearly mandates that any savings realized from securitization be passed on to the utility's customers through rate reductions. MCL 460.10d(4) and (5). Further, § 10d of the act expressly provides for additional reductions in rates by the commission during this time; therefore, what appellant refers to as a rate freeze is more properly classified as a cap, because it is subject to further reduction. There was no dispute in the proceedings before the PSC that

securitization will result in an annual cost savings of $58.7 million, $8.9 million more than the amount necessary to offset the five percent residential rate reduction mandated by the statute. The PSC ordered that half the excess be used to reduce distribution charges for nonresidential customers, and the other half be used to reduce transition charges. Thus, because the Attorney General's calculation fails to take into account the substantial amount of savings flowing from securitization, the PSC properly rejected it.

Moreover, as the PSC noted, it is difficult to accurately predict future revenue, which is the type of speculation the Attorney General's formula would require. In contrast, as the PSC observed, "a utility's revenue requirements are relatively stable from one period to the next." In fact, the Attorney General's exhibit I-49 accepts and utilizes the figures calculated by Consumers' expert for the years following 2003, which are revenue-requirement figures. In our opinion, the Attorney General improperly uses projected revenue for the first three years and revenue requirements for the years thereafter in formulating its calculation. The PSC properly rejected the Attorney General's method because it is inconsistent and admits the difficulty in projecting revenues with any accuracy for fourteen years into the future. The PSC's interpretation of the formula is entitled to deference because it is consistent with the plain language of the statute and avoids an unworkable result. *Consumers Power Co v Public Service Comm*, 460 Mich 148, 157, n 8; 596 NW2d 126 (1999). Further, because the record clearly demonstrates that securitization results

in a tangible savings to electric utility customers, subsection 10i(2)(b) has been satisfied.

The Attorney General next contends that the PSC erred in excluding certain deferred taxes from inclusion as a qualified cost under subsection 10h(g) and by including Consumers' Palisades Nuclear Power Plant as a qualified cost under that subsection. These arguments are beyond the scope of this Court's extremely limited review under subsection 10i(8), which is limited to determining whether the financing order conforms to the constitution and laws of this state and is within the authority of the commission under the act. In contrast to the previous issue raised by the Attorney General, whether certain items are qualified costs is not a matter of statutory interpretation. Subsection 10h(g) clearly provides:

> "Qualified costs" means an electric utility's regulatory assets *as determined by the commission* . . . plus any costs that *the commission determines* that the electric utility would be unlikely to collect in a competitive market . . . . [Emphasis supplied.]

Thus, because the plain language of the statute expressly authorizes the PSC to determine whether a particular item is a qualified cost under subsection 10h(g), our inquiry is at an end. Contrary to appellant's contentions, the statute does not indicate that there is a time limit requirement on this determination, and we decline the invitation to read additional language into a clearly worded statute. See *Michalski v Bar-Levav*, 463 Mich 723, 731; 625 NW2d 754 (2001); see, generally, *Michigan State AFL-CIO v Civil Service Comm*, 455 Mich 720, 741; 566 NW2d 258 (1997) (BRICKLEY, J., dissenting).

Finally, the Attorney General contends that the PSC improperly allowed Consumers to recover from its securitization savings the five percent rate reduction for the period following entry of the financing order but pending the sale of the bonds. We need not address this argument because it is beyond the limited scope of judicial review under subsection 10i(8). Moreover, the Attorney General has failed to address the requirement in subsection 10(4) that the financing order provide for full funding of the mandatory five percent rate reduction.

Affirmed.