*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

LORETTA HOBBS, Personal Representative of the
ESTATE OF CHARLIE HOLMES,

        Plaintiff-Appellant,

v

CCLA 9 LLC, doing business as RIVERVIEW
HEALTH & REHAB CENTER, and THERAPY
MANAGEMENT, INC.,

        Defendants-Appellees.

UNPUBLISHED
February 11, 2026
11:24 AM

No. 373230
Wayne Circuit Court
LC No. 23-016534-NH

Before: RICK, P.J., and YATES and MARIANI, JJ.

PER CURIAM.

In this medical malpractice action, plaintiff, acting as the personal representative of Charlie Holmes's estate, appeals by right the trial court's award of summary disposition to defendants, CCLA 9 LLC, doing business as Riverview Health & Rehab Center (Riverview), and Therapy Management, Inc., under MCR 2.116(C)(7) (immunity granted by law).[1] We affirm.

## I. BACKGROUND

On March 25, 2020, Charlie Holmes (the decedent) was admitted to the Detroit Medical Center (DMC) Harper Hospital emergency room, complaining of shortness of breath. At the time of his hospitalization, the decedent was 75 years old and suffered from a number of serious underlying health conditions. At the hospital, the decedent was diagnosed with COVID-19 pneumonia and, as a result, he was intubated. He remained hospitalized for approximately one

---

[1] Riverview and Therapy Management both moved for summary disposition under MCR 2.116(C)(7); Therapy Management also moved for summary disposition under MCR 2.116(C)(8) and (C)(10). While the trial court did not expressly specify which subrule provided the basis of its award of summary disposition, the court's decision, as discussed below, was premised on defendants' claim of statutory immunity.

-1-

month. At the end of his hospital stay, his mobility was very limited, and the decision was made to put him into a subacute rehabilitation facility. Before leaving the hospital, the decedent tested negative for COVID-19.

After he was discharged from the hospital, the decedent was transferred to the care of defendant Riverview for rehabilitation. Defendant Therapy Management provided occupational and physical therapy services to the decedent while he was at Riverview. Plaintiff alleges that, on May 5, 2020, an unknown staff member employed by one of the defendants placed a heating pad on the decedent's legs and left it there while he slept. According to plaintiff, no one returned to check on the heating pad and, when the decedent awoke, he had severe burns on his legs. The next day, the decedent left Riverview for dialysis treatment but his blood pressure was too low for dialysis, so he was transported to the emergency room at DMC Harper Hospital. He did not return to Riverview. In August 2020, the decedent was able to return home, but he remained wheelchair bound. He later died after contracting an unknown infection in March 2021.

Plaintiff filed the instant lawsuit in December 2023, alleging medical malpractice, ordinary negligence, and deliberate indifference which led to the decedent's burns from the heating pad while at Riverview. Riverview moved for summary disposition under MCR 2.116(C)(7) in May 2024, arguing that it was immune from liability under the Pandemic Health Care Immunity Act (PHCIA), MCL 691.1471 *et seq*., and the Public Readiness and Emergency Preparedness Act (PREP Act), 42 USC 247d-6d. Therapy Management filed a concurrence to Riverview's motion for summary disposition, and also separately moved for summary disposition under MCR 2.116(C)(7), (C)(8), and (C)(10). In Therapy Management's separately filed motion, it argued that it was immune from liability under the PHCIA, but did not also argue for immunity under the PREP Act.

In her responses to defendants' motions, plaintiff argued that the PHCIA's immunity did not apply to the decedent's case because neither defendant was providing health care services "in support of this state's response to the COVID-19 pandemic" when the decedent was injured, as the PHCIA required. Plaintiff further argued that, even if the PHCIA's immunity was found to apply, the retroactive application of that immunity was unconstitutional because it divested plaintiff of her right to sue, which amounted to a due-process violation and an impermissible taking under the United States and Michigan constitutions. And even if the PHCIA were applicable and constitutional, plaintiff maintained that her allegations of deliberate indifference fell within the "gross negligence" exception to the PHCIA's immunity. As to Riverview's argument regarding PREP Act immunity, plaintiff maintained that the act was inapplicable because Riverview was not administering any "covered countermeasures" in the decedent's case. Riverview and Therapy Management both replied, contending that plaintiff's allegations fell within the scope of the PHCIA's immunity, that those allegations were insufficient to support invocation of the "gross negligence" exception to that immunity, and that plaintiff had failed to show that retroactive application of the immunity would violate her constitutional rights.

The trial court ultimately determined that defendants were immune from liability under the PHCIA and granted their motions for summary disposition. The court opined that there was a sufficient connection between the state's response to the COVID-19 pandemic and the decedent's claims because the decedent was being treated at Riverview to recover from his COVID-19 infection. The trial court also rejected plaintiff's constitutional challenge to the PHCIA, explaining

that the Legislature had expressly made the statute retroactive and plaintiff had failed to demonstrate that, as a result of that retroactivity, she was deprived of a vested right. Finally, the trial court concluded that plaintiff had failed to allege sufficient facts to support a claim of gross negligence against either defendant, such that the PHCIA's immunity would not apply. This appeal followed.

## II. STATUTORY IMMUNITY UNDER THE PHCIA

Plaintiff claims that the trial court erred by concluding that her suit was barred by the PHCIA's grant of immunity. We disagree.

### A. STANDARD OF REVIEW

We review de novo a trial court's decision to grant or deny summary disposition. *Krieger v Dep't of Environment, Great Lakes & Energy*, 348 Mich App 156, 170; 17 NW3d 700 (2023). We also review de novo questions of statutory interpretation. *Id*. at 467.

A defendant is entitled to summary disposition under MCR 2.116(C)(7) if, among other things, the plaintiff's claims against it are barred because of "immunity granted by law." When evaluating a motion brought under MCR 2.116(C)(7), the court must consider the affidavits, depositions, admissions, or other documentary evidence submitted by the parties. MCR 2.116(G)(5). "The contents of the complaint are accepted as true unless contradicted by the evidence provided." *Odom v Wayne Co*, 482 Mich 459, 466; 760 NW2d 217 (2008) (citation and quotation marks omitted).

### B. DEVELOPMENT AND SCOPE OF THE PHCIA

As a part of the state's response to the COVID-19 pandemic, Governor Gretchen Whitmer issued a series of executive orders affording immunity to healthcare professionals and facilities in certain circumstances. The first such order, Executive Order No. 2020-30, issued on March 29, 2020, provided:

> Consistent with MCL 30.411(4), any licensed health care professional or designated health care facility that provides medical services in support of this state's response to the COVID-19 pandemic is not liable for an injury sustained by a person by reason of those services, regardless of how or under what circumstances or by what cause those injuries are sustained, unless it is established that such injury or death was caused by the gross negligence, as defined in MCL 30.411(9), of such health care professional or designated health care facility. [EO 2020-30, p 4.]

On April 26, 2020, Governor Whitmer issued Executive Order No. 2020-61, which continued this grant of immunity. EO 2020-61, p 5. On July 13, 2020, Governor Whitmer issued Executive Order No. 2020-150, which rescinded EO 2020-61 and ended this grant of immunity, explaining that the pressure on Michigan's hospitals had eased and the necessity of the broad relief provided in EOs 2020-30 and 2020-61 had waned. See EO 2020-150, p 2.

In October 2020, the Legislature enacted the PHCIA, which codified the immunity that had been provided in EOs 2020-30 and 2020-61. 2020 PA 240. In alignment with the timeframe of the executive orders' grant of immunity, the PHCIA expressly provided that its "liability protection . . . applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020." MCL 691.1477. And in defining the scope of its immunity, the PHCIA closely tracked the language of the executive orders:

> A health care provider or health care facility that provides health care services in support of this state's response to the COVID-19 pandemic is not liable for an injury, including death, sustained by an individual by reason of those services, regardless of how, under what circumstances, or by what cause those injuries are sustained, unless it is established that the provision of the services constituted willful misconduct, gross negligence, intentional and willful criminal misconduct, or intentional infliction of harm by the health care provider or health care facility. [MCL 691.1475.]

This Court has addressed the PHCIA's grant of immunity in three published opinions. In *Franklin v McLaren Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 366226); slip op at 9, this Court recognized that the immunity conferred by the PHCIA is not limited to services provided to directly treat a patient for COVID-19. In that case, the plaintiff was hospitalized in March 2020 for COVID-19 and developed pressure ulcers while in the hospital. *Id*. at ___; slip op at 1-2. He later sued the defendants for negligence, arguing that they breached the applicable standards of care, including by "failing to correctly assess plaintiff's risk factors for developing pressure ulcers, reposition[] plaintiff to prevent development of wounds, provid[e] appropriate treatment, and other failures to act." *Id*. at ___; slip op at 2. This Court concluded that the plaintiff's claims were barred by the PHCIA because the pressure ulcers he developed while being treated for COVID-19 "were a consequence of the care [the] defendant provided in response to COVID-19":

> Plaintiff alleged that he developed multiple pressure ulcers in defendant's care. Those injuries were a consequence of the care defendant provided in response to COVID-19. Stated otherwise, those injuries were sustained by reason of the healthcare services provided by defendant in support of the state's response to the COVID-19 pandemic. Plaintiff presented at the hospital with signs of COVID-19, was admitted to the COVID-19 floor for COVID-19 treatment, and allegedly developed pressure ulcers as a result of that care. Such a sequence of events is covered by the plain language of the statute. [*Id*. at ___; slip op at 9-10.]

Next, in *Skipper-Baines v Bd of Hosp Managers for City of Flint*, ___ Mich App ___, ___; ___ NW3d ___ (2024) (Docket No. 365137); slip op at 4, this Court reaffirmed its holding in *Franklin* while making clear that, in order for the PHCIA's immunity to apply, there must be a "connection between the alleged malpractice and the pandemic." In that case, the decedent was admitted to the hospital after being found unresponsive by his granddaughter. *Id*. at ___; slip op at 1. In the hospital, he shared a room with a "mentally unstable roommate who had a known propensity for violent outbursts." *Id*. While the decedent was recovering from gallbladder surgery, his roommate attacked him with an IV pole. *Id*. at ___; slip op at 1-2. The decedent was severely injured, and he ultimately died. *Id*. At some point during his hospitalization, he contracted

-4-

COVID-19, and his cause of death was listed as "COVID-19 associated pneumonia and complications thereof . . . ." *Id.* The plaintiff brought suit on behalf of the decedent's estate, alleging both medical malpractice and ordinary negligence arising from the acts and omissions of the defendant that made it possible for the decedent to be assaulted by his roommate. *Id.*

This Court held that the PHCIA did not bar the plaintiff's suit because the "[t]he alleged acts, omissions, and injuries were wholly unrelated to the pandemic." *Id.* at ___; slip op at 2. As this Court explained, the case "stem[med] entirely from the beating inflicted upon the decedent by his roommate," with the alleged negligent acts and omissions being his placement in a room with an unsafe roommate and the failure "to deploy adequate safeguards to protect" him from that roommate. *Id.* at ___; slip op at 2. "[T]he decedent did not contract COVID-19 until after he was hospitalized due to an unrelated illness, and at the time of the attack, he was recovering from a gallbladder procedure." *Id.* "The roommate was likewise not being treated for COVID-19, and there is no suggestion that COVID-19 in some way spurred the attack." *Id.* This Court stressed that it was "not hold[ing] that immunity only applies when a patient is being treated for COVID-19, but it is clear that there must be some connection." *Id.* at ___; slip op at 3. And unlike in *Franklin*, where there "was a clear connection between the pandemic and the services giving rise to the cause of action," there was, in *Skipper-Baines*, "simply no connection between the pandemic and the alleged negligence/malpractice." *Id.*

Finally, in *Jokinen v Beaumont Hosp Troy*, ___ Mich App ___, ___; ___NW3d ___ (2025) (Docket No. 370983); slip op at 1, the decedent was transferred from a senior living facility to the defendant's hospital, suffering from an "altered mental status" after a fall. She received wound care for, among other things, a skin tear on her buttocks. *Id.* at ___; slip op at 1-2. After she was discharged from the defendant's hospital, a pressure injury was observed on her. *Id.* She was ultimately readmitted to the hospital with a sacral decubitus ulcer, and shortly thereafter she passed away from "sepsis due to infected decubitus ulcer, cardio myopathy, and . . . coronary artery disease." *Id.* at ___; slip op at 2. The plaintiff sued the defendants for negligently treating the decedent's pressure wounds. *Id.* This Court held that the defendants were not entitled to immunity under the PHCIA, explaining that "the decedent in this case was not admitted to the hospital with symptoms of COVID-19, she was never treated for COVID-19, and there is no indication that she ever tested positive for COVID-19." *Id.* at ___; slip op at 7. This Court further observed, as it did in *Skipper-Baines*, that the " 'Legislature and the Governor would not have limited the immunity conferred pursuant to this statute to services supporting the pandemic response if it actually intended for all medical providers to be immune from all liability short of gross negligence.' " *Id.*, quoting *Skipper-Baines*, ___ Mich App at ___; slip op at 3.

## C. DISCUSSION

Applying this Court's precedent, we find no error in the trial court's conclusion that defendants are entitled to immunity under the PHCIA in this case. The parties do not dispute that defendants are entities covered by the PHCIA's grant of immunity and that the services at issue occurred during the statutorily specified time period for that immunity. Nor does plaintiff challenge on appeal the trial court's conclusion that she failed to sufficiently plead gross negligence in the provision of those services, such that the PHCIA's immunity would not apply. And we agree with the trial court's conclusion that defendant's alleged negligence and malpractice in providing services to the decedent falls within the scope of the PHCIA's immunity, given the

connection between that alleged negligence and malpractice and the COVID-19 pandemic. See *Skipper-Baines*, ___ Mich App at ___; slip op at 4.

Although none of the published authority regarding the PHCIA is quite on all fours with this case, we find *Franklin* to be most analogous to it. As in *Franklin*, the decedent in this case was brought under care to receive treatment for COVID-19. Plaintiff correctly notes that, unlike *Franklin*, the decedent here tested negative for COVID-19 before he was admitted to Riverview and the alleged negligence and malpractice occurred. But the purpose of the decedent's admission and treatment at Riverview was to recuperate from his hospitalization for COVID-19, which left him, as alleged in the complaint, "significantly debilitated from his time in the ICU and prolonged intubation and . . . dependent on the staff to provide care and maintain his safety." Similarly, while the decedent's claimed injury resulted not from direct treatment for COVID-19 but from the alleged failure to monitor the use of a heating pad on his legs, such "regular medical care" can still fall within the scope of the PHCIA's immunity if it bears the requisite connection with the pandemic. *Franklin*, ___ Mich App at ___; slip op at 8; see also *Skipper-Baines*, ___ Mich App at ___; slip op at 4. We, like the trial court, find that requisite connection here, given that the decedent was admitted for care at Riverview to complete his recovery from COVID-19 and he suffered his alleged injury in the course of receiving that care.

Plaintiff eschews reliance on *Franklin* and points to *Skipper-Baines* and *Jokinen* instead, but those cases do not aid her position. As discussed, in *Skipper-Baines*, ___ Mich App at ___; slip op at 2, the alleged negligence and malpractice was "wholly unrelated to the pandemic," arising from the decedent's beating by his roommate while neither was being treated for COVID-19 and with nothing to otherwise connect the attack to the pandemic. And in *Jokinen*, ___ Mich App at ___; slip op at 6, "the decedent . . . was not admitted to the hospital with symptoms of COVID-19, she was never treated for COVID-19, and there is no indication that she ever tested positive for COVID-19." *Id.* at ___; slip op at 7. For the reasons set forth above, the facts of this case are distinguishable, and more closely resemble the "clear connection" found in *Franklin*. *Skipper-Baines*, ___ Mich App at ___; slip op at 3. No better is plaintiff's attempt to distinguish between "acts" and "omissions" in the decedent's care; this Court has previously analyzed the applicability of the PHCIA's immunity without regard to that distinction, and we see no reason to do otherwise here. See *Franklin*, ___ Mich App at ___; slip op at 1 (concluding that the PHCIA's immunity was applicable to the defendant's alleged "failures to act"); *Skipper-Baines*, ___ Mich App at ___; slip op at 4 (holding that the PHCIA's immunity was not applicable when "[t]he alleged acts, *omissions*, and injuries were wholly unrelated to the pandemic") (emphasis added).

In sum, the trial court's decision was supported by this Court's binding precedent interpreting the PHCIA's grant of immunity, and plaintiff has not demonstrated that the trial court erred by awarding defendants summary disposition on this basis.

III. RETROACTIVITY OF THE PHCIA

Plaintiff next argues that the retroactive application of the PHCIA's immunity is unconstitutional because it deprives her of a vested right to sue defendants without them having immunity, and the trial court erred by concluding otherwise. Here too, we disagree.

"Whether a statute is constitutional is a question of law that we review de novo." *League of Women Voters of Mich v Secretary of State*, 508 Mich 520, 534; 975 NW2d 840 (2022). A statute is presumed to be constitutional "unless its unconstitutionality is clearly apparent." *Id.* (citation and quotation marks omitted). When examining whether the retroactive application of a statute is unconstitutional, a court must first examine whether the Legislature intended the statute to apply retroactively. *GMAC LLC v Dep't of Treasury*, 286 Mich App 365, 376-377; 781 NW2d 310 (2009). "The general rule is that an amended statute is given prospective application unless the Legislature expressly or impliedly identifies its intention to give the statute retrospective effect." *Id.* Having determined the Legislature intended retroactive application, the court must then determine whether such application would violate constitutional principles.

In the instant case, MCL 691.1477 expressly states that the immunity provided by the PHCIA "applies retroactively, and applies on or after March 29, 2020 and before July 14, 2020." Accordingly, as the trial court correctly recognized, it is clear that the Legislature intended the PHCIA to apply retroactively. And we also agree with the trial court that plaintiff has not demonstrated that such retroactive application is unconstitutional. As plaintiff acknowledges, her theories of unconstitutionality—that retroactive application amounts to a due-process violation and also an impermissible taking—both require that she prove the existence and impairment of a vested right. See, e.g., *Gen Motors Corp v Dep't of Treasury*, 290 Mich App 355, 370; 803 NW2d 698 (2010) ("[T]o be protected by the Due Process Clause, a property interest must be a vested right.") (citation and quotation marks omitted); *Attorney Gen v Mich Pub Serv Comm*, 249 Mich App 424, 436; 642 NW2d 691 (2002) (explaining that "[o]ne who asserts an uncompensated taking claim must first establish that a vested property right is affected") (quotation marks and citation omitted). Plaintiff's claimed right is to sue defendants in this case without immunity, but plaintiff cannot show that she had, or that the PHCIA's retroactive application deprived her of, any such vested right. On May 5, 2020—the date when plaintiff alleges the decedent was injured—Executive Order 2020-61 was in effect and provided the same immunity that was later codified in the PHCIA. Consequently, when plaintiff's claim accrued, defendants were already entitled to immunity under Executive Order 2020-61, and plaintiff's right to sue them was no different in that regard than it was after the PHCIA was enacted in October 2020. Plaintiff has thus failed to show that the PHCIA's retroactive application violated her constitutional rights.[2]

---

[2] In a footnote in her appellate reply brief to Therapy Management, plaintiff makes a passing remark that "EO 2020-30 became invalid after April 30, 2020" and "the Governor had no other valid authority to issue emergency orders." Plaintiff, however, also stated in that reply brief that "discussion of executive orders" was "unrelated to the merits of this appeal," and she said nothing regarding the orders' validity in her appellate reply brief to Riverview or in either of her principal briefs on appeal. Nor did she raise any such argument before the trial court. Accordingly, to the extent plaintiff intended to put at issue the executive orders' validity, any such argument has been both waived and abandoned. See *Tolas Oil & Gas Exploration Co v Bach Servs & Mfg, LLC*, 347 Mich App 280, 289; 14 NW3d 472 (2023); *Greater Bethesda Healing Springs Ministry v Evangel Builders & Const Managers, LLC*, 282 Mich App 410, 413; 766 NW2d 874 (2009). Furthermore, courts, including this one, have already rejected that line of argument. See *Skatemore, Inc v*

Accordingly, we see no error in the trial court's determination that defendants were entitled to summary disposition in this case on the basis of the immunity granted to them under the PHCIA.[3]

Affirmed.

/s/ Michelle M. Rick
/s/ Christopher P. Yates
/s/ Philip P. Mariani

---

*Whitmer*, 40 F4th 727, 736 (CA 6, 2022); *Gillman v Kent County Health Department*, unpublished per curiam opinion of the Court of Appeals, issued November 17, 2022 (Docket No. 360586), p 2.

[3] Because we hold that defendants were immune from suit under the PHCIA, we need not—and do not—reach Riverview's argument that it was also immune under the PREP Act.